**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

HOSMAY JORRIN,

          Plaintiff,

   v.

LIDESTRI FOODS, INC., et al.,

          Defendants.

Civil No. 11-2064 (NLH/AMD)

**OPINION**

**APPEARANCES:**

Daniel T. Silverman, Esquire
Kevin M. Costello, Esquire
Costello & Mains, P.C.
18000 Horizon Way
Suite 800
Mount Laurel, New Jersey 08054
    *Attorneys for Plaintiff Hosmay Jorrin*

Douglas Diaz, Esquire
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, New Jersey 08033
    *Attorney for Defendant Lidestri Foods, Inc.*[1]

**<u>HILLMAN, District Judge</u>**

    This matter comes before the Court by way of Defendant

Lidestri Foods, Inc.'s motion [Doc. No. 19] seeking summary

---

    [1] Although Plaintiff's complaint also names Lidestri Food and Beverage, Lidestri Food and Beverage d/b/a Lidestri Foods, Inc., and Lidestri Foods d/b/a Lidestri Food and Beverage as defendants in this case, the record reflects that Lidestri Foods, Inc. is the proper Defendant and that these remaining names are simply "doing business as" designations of Lidestri Foods, Inc. (<u>See</u> Notice of Removal [Doc. No. 1] ¶ 1.)

judgment pursuant to Federal Rule of Civil Procedure 56.  The Court has considered the parties' submissions and decides this matter pursuant to Federal Rule of Civil Procedure 78.

For the reasons expressed below, Defendant's motion for summary judgment is granted.

## I.  <u>JURISDICTION</u>

Plaintiff originally filed the complaint in this action in the Superior Court of New Jersey, Camden County, Law Division asserting claims of sexual harassment, retaliation, and retaliatory termination in violation of the New Jersey Law Against Discrimination ("NJLAD").  Defendant Lidestri Foods, Inc. ("Lidestri") removed the action to this Court pursuant to 28 U.S.C. § 1441, <u>et seq.</u>, asserting original jurisdiction exists over Plaintiff's state law claims based on diversity of citizenship.

The Court exercises jurisdiction in this case pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship between the parties and an amount in controversy in excess of $75,000.  Plaintiff Hosmay Jorrin is a citizen of the state of New Jersey. (Notice of Removal [Doc. No. 1] ¶ 3(a).)  Lidestri is incorporated in, and maintains its principal place of business in, the state of New York.  (<u>Id.</u> ¶ 3(b).)  The amount in controversy is met because the allegations contained in Plaintiff's complaint sufficiently demonstrate that the damages

sought are in excess of $75,000, exclusive of interest and costs.[2]

## II.  <u>BACKGROUND</u>

The basic facts of this case are largely undisputed and relate to Plaintiff's allegations that he was subjected to sexual harassment and retaliation during his employment at Lidestri.  In April of 2008, Plaintiff, a Hispanic male, was hired to work for Lidestri as a forklift operator at its Pennsauken, New Jersey manufacturing facility.  (Lidestri's Statement of Undisputed Material Facts [Doc. No. 19-3] (hereinafter, "Lidestri's Statement"), ¶¶ 1-2; Pl.'s Reply to Def.'s Statement of Undisputed Material Facts [Doc. No. 23-1] (hereinafter, "Pl.'s Statement"), ¶¶ 1-2.)  Lidestri's Pennsuaken facility consists of two separate buildings: a warehouse building known, as the "1600 Building," and a production building where the receiving dock was located, known as the "1550 Building."  (Lidestri's Statement ¶ 1; Pl.'s Statement ¶ 1.)

During the course of his employment, Plaintiff worked in the 1550 Building and he considered warehouse shift manager, Roger

---

[2] The record reflects that Roger Carter, while named as a defendant, was not served within 120 days of the filing of the complaint as required by Federal Rule of Civil Procedure 4(m), and it appears that Plaintiff has abandoned any claims asserted against Carter in this action and is proceeding only against the corporate defendant, Lidestri.  Pursuant to Rule 4(m), the Court dismisses Plaintiff's action against Carter without prejudice, and exercises jurisdiction over the real parties in interest here pursuant to 28 U.S.C. § 1332.

Valladares, to be his "main supervisor." (Lidestri's Statement ¶ 2, 21; Pl.'s Statement ¶ 2, 21.) In the fall of 2010, the time period relevant to this action, Plaintiff worked the second shift at the 1550 Building, but did not work on Fridays. (Lidestri's Statement ¶ 20; Pl.'s Statement ¶ 20.) Near the end of September 2010, another warehouse shift manager, Michael Shaw, began working the second shift on both Thursday and Fridays. (Lidestri's Statement ¶¶ 14, 19; Pl.'s Statement ¶ 14, 19.) Shaw's primary responsibility at Lidestri was oversight of the 1600 Building where his office was located. (Lidestri's Statement ¶ 15; Pl.'s Statement ¶ 15.) However, while working the second shift Shaw "would see the employees in the 1550 [B]uilding maybe two or three times a day in passing just to ensure the employees were performing their assigned tasks." (Lidestri's Statement ¶ 23; Pl.'s Statement ¶ 23.)

On December 13, 2010, Kathleen Jehens, Lidestri's Human Resources Manager at the Pennsuaken facility, received a letter written by Plaintiff advising Lidestri that he had been sexually harassed by Shaw while working his Thursday shifts in the 1550 Building. (Lidestri's Statement ¶¶ 39-43; Pl.'s Statement ¶¶ 39-43; see also Undated Letter from Plaintiff, Ex. 9 to Lidestri's Statement, 1.) Shaw's conduct toward Plaintiff included the following: (1) a statement by Shaw to Plaintiff that "with that sexy accent you should f[***] a lot of b[******]"; (2) a

4

statement by Shaw that Plaintiff's "hairless face" was "sexy";
(3) conduct wherein Shaw would touch or rub Plaintiff's shoulder;
(4) conduct wherein Shaw would rub his own nipples in front of
Plaintiff; and (5) Shaw's statement to Plaintiff that Shaw "did
not fight, he scratches." (Lidestri's Statement ¶ 27; Pl.'s
Statement ¶ 27.) Plaintiff classified Shaw's conduct as an
attempt "to play sexual games with" Plaintiff which made
Plaintiff feel "disrespected" as a man. (Lidestri's Statement ¶
26; Pl.'s Statement ¶ 26.) Plaintiff also alleged that on one
particular Thursday in early December 2010, while Plaintiff was
working in the glass line area of the 1550 Building, Shaw
approached Plaintiff from behind and rubbed against Plaintiff
with Shaw's midsection, including his penis. (Lidestri's
Statement ¶ 35; Pl.'s Statement ¶ 35.)

Upon receipt of Plaintiff's letter on December 13, 2010,
Jehens began an internal investigation into Plaintiff's
allegations against Shaw commencing the following morning on
December 14, 2010.[3] (Lidestri's Statement ¶ 44; Pl.'s Statement
¶ 44.) Moreover, Lidestri removed Shaw from serving as
Plaintiff's shift manager on Thursdays after receipt of the

---

[3] Jehens apparently commenced the investigation on December
14, 2010 because she did not receive Plaintiff's letter until
late in the afternoon on December 13, 2010 at approximately 4:45
p.m. (Ex. 1 to Lidestri's Statement, Certification of Jehens ¶
11.)

letter.[4]   (Lidestri's Statement ¶ 45; Pl.'s Statement ¶ 45.)
Jehens' investigation consisted of interviews of ten Lidestri
employees from December 14, 2010 through December 21, 2010,
including Plaintiff and Shaw.  (Lidestri's Statement ¶¶ 46-47,
49; Pl.'s Statement ¶¶ 46-47, 49.)   After Jehens completed her
investigation, she advised Jane Oca, Lidestri's Corporate Human
Resources Manager, of what the employees reported in the
interviews.  (Lidestri's Statement ¶ 57; Pl.'s Statement ¶ 57.)
Oca then discussed the matter with Lidestri's Vice-President,
Donna Yanicky, and the Director of the Warehouse, Lee Biscardi,
who collectively decided to terminate Shaw's employment.
(Lidestri's Statement ¶ 58; Pl.'s Statement ¶ 58.)   Shaw was
terminated from Lidestri on December 22, 2010, approximately
eleven (11) days after Jehens first received Plaintiff's letter.
(Lidestri's Statement ¶ 59; Pl.'s Statement ¶ 59.)

    Plaintiff contends that after Shaw was terminated other
warehouse shift managers at Lidestri, specifically Roger Carter
and Michael DiMaio, retaliating against Plaintiff by going to
Plaintiff's worksite every day to check on him, by "overchecking"
on Plaintiff, and by returning to Plaintiff's worksite again at

---

    [4] The record reflects that Lidestri decided to suspend
Shaw's employment during the course of the internal investigation
beginning on December 14, 2010.  (Ex. 11 to Lidestri's Statement,
Tr. of Oca's Dep. 26:18-27:7.)

night for an additional visit.[5]   (Lidestri's Statement ¶¶ 77-79;
Pl.'s Statement ¶¶ 77-79.)   Several weeks later, on January 13,
2011, Lidestri terminated Plaintiff's employment on the basis of
insubordination and cursing at a supervisor in relation to an
alleged incident which occurred that same day between DiMaio and
Plaintiff.  (Lidestri's Statement ¶¶ 72-76.)   Plaintiff denies
that he engaged in any form of insubordination or cursing, and
that he was terminated in retaliation for having made a complaint
of sexual harassment.  (Pl.'s Statement ¶ 72.)

Based on these facts, Plaintiff brings a three count
complaint asserting a claims for sexual harassment, retaliation,
and retaliatory discharge in violation of the NJLAD.  As to his
claim for sexual harassment, Plaintiff alleges that Lidestri is
responsible for Shaw's conduct based on Shaw's status as a
supervisor, because Lidestri failed to reasonably promulgate a
policy prohibiting such harassment, and because the harassment
Plaintiff experienced qualifies as sexual harassment under the
NJLAD.  (Compl. ¶¶ 33-35.)   Plaintiff further claims that he
engaged in protected conduct under the NJLAD by complaining of
Shaw's conduct, which was a determinative and motivating factor
in the severe and pervasive retaliatory harassment he was
subjected to.  (Id. ¶ 38.)   Finally, with respect to his

_____

[5] Plaintiff disputes that "it was Carter's sole intention"
to check on Plaintiff because "Carter's action were done in an
intimidating fashion."  (Pl.'s Statement ¶ 78.)

termination, Plaintiff contends that shortly after he engaged in this protected conduct, he was terminated and "his membership in a protected group and ... his protected conduct under the LAD" were determinative and motivating causes for his discharge.  (Id. ¶¶ 41-42.)

## III.  <u>DISCUSSION</u>

### A.   **Summary Judgment Standard**

In the present motion, Lidestri seeks the entry of summary judgment in its favor on all of Plaintiff's claims under the NJLAD.  Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  <u>Id.</u>  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence;

instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.") (citing Celotex, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Celotex, 477

U.S. at 324.  A "party opposing summary judgment may not rest upon the mere allegations or denials of the ... pleading[s.]" *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (internal quotations omitted).  For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  <u>Cooper v. Sniezek</u>, 418 F. App'x 56, 58 (3d Cir. 2011) (citing <u>Celotex</u>, 477 U.S. at 322 ).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57.

**B.   NJLAD Sexual Harassment Hostile Environment Claims**

As the New Jersey Supreme Court has long recognized, "New Jersey has a strong interest in maintaining 'discrimination-free workplace[s]' for workers."  *Cutler v. Dorn*, 955 A.2d 917, 923 (N.J. 2008) (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 452 (1993)).  The NJLAD makes it an unlawful

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex ... of any individual, ... to refuse to hire or employ or to bar or to discharge ... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

10

Lehmann, 626 A.2d at 452 (citing N.J. STAT. ANN. § 10:5-12(a)).[6]

More recently the New Jersey Supreme Court reiterated that "the basic requirements for determining whether workplace acts of sexual harassment constitute prohibited discrimination under the LAD" were established in Lehmann.  Cutler, 955 A.2d at 924. Specifically, the New Jersey Supreme Court requires a plaintiff claiming a hostile workplace based on acts of sexual harassment to prove that

> the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.

Cutler, 955 A.2d at 924 (citing Lehmann, 626 A.2d at 453).[7]

---

[6] The current version of Section 10:5-12(a) now also prohibits discrimination or harassment based on civil union status, domestic partnership status, genetic information, gender identity or expression, and disability.  N.J. STAT. ANN. § 10:5-12(a) (West 2013).

[7] Citing to Lehmann, Lidestri argues on that to establish a hostile work environment claim under the NJLAD a plaintiff "must prove: (1) he suffered intentional discrimination which would not have occurred but for his gender, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would detrimentally affect a reasonable person of similar gender in the position, and (5) the existence of respondeat superior liability."  (Br. of Def. Lidestri Foods, Inc. in Supp. of its Mot. for Summ. J. [Doc. No. 19-1] (hereinafter, "Def.'s Br."), 9-10.)
The Court notes that the elements recited by Lidestri are not actually the elements delineated by the New Jersey Supreme Court in Lehmann.  It appears that Lidestri is relying on a formulation of the elements required for a sexual harassment hostile work environment claim brought under Title VII of the Civil Rights Act announced by the Third Circuit in Andrews v.

Although the <u>Lehmann</u> standard is couched in terms of a

"reasonable woman" — the relevant consideration in the majority

---

City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).
However, in <u>Lehmann</u>, the New Jersey Supreme Court, "[r]ather than
risking confusion by engrafting major revisions to the <u>Andrews</u>
test, ... announce[d] a new test" with respect to sexual
harassment hostile work environment claims.  626 A.2d at 453.

     In <u>Lehmann</u>, the Court expressly rejected <u>Andrews</u>'
requirement that a plaintiff show the employer's discrimination
or harassment was intentional.  <u>Id.</u> at 454 ("The LAD is not a
fault- or intent-based statute.  A plaintiff need not show that
the employer intentionally discriminated or harassed her, or
intended to create a hostile work environment.") The Court also
explicitly considered but abandoned that portion of <u>Andrews</u> which
examined a plaintiff's subjective viewpoint of the alleged
harassment and opted instead for an objective standard.  <u>Id.</u> at
457-58 ("[W]e choose an objective rather than a subjective
viewpoint because the purpose of the LAD is to eliminate real
discrimination and harassment."); <u>see also</u> <u>Cutler</u>, 955 A.2d at
924 ("[N]either 'a plaintiff's subjective response' to the
harassment,... nor a defendant's subjective intent when
perpetrating the harassment, ... is controlling of whether an
actionable hostile environment claim exists.  Whether harassing
conduct makes a work environment hostile is assessed by use of a
reasonable person standard.")

     Lidestri also relies on <u>Kunin v. Sears Roebuck & Co.</u>, 175
F.3d 289, 293 (3d Cir. 1999) for the proposition that Plaintiff
must establish the existence of respondeat superior liability on
his sexual harassment claim, but the Court notes that this
element similarly stems from the Third Circuit's holding in
<u>Andrews</u>.  However, the New Jersey Supreme Court has held "that
employer liability for supervisory hostile work environment
sexual harassment [under the NJLAD] shall be governed by agency
principles."  Lehmann, 626 A.2d at 461.  Accordingly, "an
employer whose supervisory employee is acting within the scope of
his or her employment will be liable for the supervisor's conduct
in creating a hostile work environment" as well as those
situations where the "supervisor is acting outside the scope of
his or her employment," but the supervisor's behavior falls
within one of the exceptions outlined by Section 219(2) of the
Restatement (Second) of Agency.  Id. at 462.

     Thus, to the extent Lidestri asserts arguments inconsistent
with New Jersey law, the Court disregards those arguments in
ruling on the present motion.

of cases — the standard clearly "applies to sexual harassment of women by men, men by women, men by men, and women by women.  The LAD protects both men and women and bars both heterosexual and homosexual harassment."  626 A.2d at 454.  Thus, when the plaintiff is male, as is the case here, the only difference in the standard is that a male plaintiff must "allege conduct that a reasonable man would believe altered the conditions of his employment and created a working environment that was hostile to men."  Id.

**B.   Retaliation Under the NJLAD**

Under the NJLAD, "it is unlawful to 'take reprisals against any person because that person has opposed any practices or acts forbidden under the [LAD].'"  Young v. Hobart West Group, 897 A.2d 1063, 1072 (N.J. Super. Ct. App. Div. 2005) (citing N.J. Stat. Ann. § 10:5-12d).  As recognized by the New Jersey Supreme Court,

> the protection against retaliation embodied in the LAD is broad and pervasive, and must be seen as necessarily designed to promote the integrity of the underlying antidiscrimination policies of the Act by protecting against reprisals "any person" who has sought to protect his or her own rights not to be discriminated against or who has acted to support such conduct.

Quinlan v. Curtiss-Wright Corp., 8 A.3d 209, 221 (N.J. 2010) (citing Craig v. Suburban Cablevision, Inc., 644 A.2d 112 (N.J. Super. Ct. App. Div. 1994), aff'd, 660 A.2d 505 (1995)).

To establish a prima facie case for retaliation under the

NJLAD, a "plaintiff must demonstrate: (1) that [plaintiff] engaged in protected activity; (2) the activity was known to the employer; (3) plaintiff suffered an adverse employment decision; and (4) there existed a causal link between the protected activity and the adverse employment action." <u>Young</u>, 897 A.2d at 1072 (citing <u>Craig</u>, 660 A.2d at 508).  After a plaintiff satisfies its burden to establish a prima facie case, "the defendant[] must 'articulate a legitimate, non-retaliatory reason for the [adverse employment] decision." <u>Young</u>, 897 A.2d at 1072-73 (citing <u>Romano v. Brown & Williamson Tobacco Corp.</u>, 665 A.2d 1139, 1142 (N.J. Super. Ct. App. Div. 1995)).  Upon defendant's proffer of a legitimate, non-retaliatory reason for the challenged adverse employment decision, "the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." <u>Romano</u>, 665 A.2d at 1142.

## IV.  **<u>ANALYSIS</u>**

Lidestri argues that summary judgment is appropriate in this case because: (1) Plaintiff has failed to demonstrate that the conduct at issue on his sexual harassment claim was sufficiently severe or pervasive enough to make a reasonable man believe the conditions of his employment were altered and the working environment was hostile or abusive; 2) Lidestri is not

14

vicariously liable for Shaw's conduct; and (3) Plaintiff has failed to establish a prima facie case of retaliation, and that even if he could, Plaintiff cannot demonstrate that Lidestri's legitimate non-retaliatory reason for terminating Plaintiff was a pretext.

**A.    Sexual Harassment Hostile Environment Claim**

*Lidestri's Liability as Plaintiff's Employer*

Even assuming that Plaintiff could demonstrate that Shaw's conduct was sufficiently severe or pervasive enough to make a reasonable man believe the conditions of employment were altered and the working environment was hostile,[8] Plaintiff has failed to

---

[8] Lidestri argues that Shaw's conduct was not objectively severe or pervasive such that a reasonable man would have believed that the conditions of his employment were altered and the working environment was hostile or abusive.  (Id.); see Lehmann, 626 A.2d at 453-54.

Assessing whether the alleged harassing conduct is severe or pervasive, requires an examination of the totality of the circumstances as opposed to consideration of each incident in isolation.  Cutler, 955 A.2d at 924.  Here, the Court "must consider the cumulative effect of the various incidents, bearing in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes."  Lehmann, 626 A.2d at 455 (citations and internal quotations omitted).  Under this standard, it is "the cumulative impact of separate successive incidents that cements the hostile work environment."  Cutler, 955 A.2d at 925.

In evaluating severity or pervasiveness the Court considers the nature of the conduct itself, "rather than the effect of the conduct on any particular plaintiff."  El-Sioufi v. St. Peter's Univ. Hosp., 887 A.2d 1170, 1190 (N.J. Super. Ct. App. Div. 2005).  Thus, "whether an environment is hostile or abusive can be determined only [by] looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

demonstrate a genuine issue of material fact supporting the

---

a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance." El-Sioufi, 887 A.2d at 1190 (citations and internal quotations omitted).

We consider this issue a close call. First, we note that the defendant certainly considered it severe enough to terminate Shaw. On the one hand, much of Shaw's conduct was verbal in nature and could be fairly described as teasing or off-hand remarks. In this regard, it is important to note though that "not every offensive remark, even if direct, is actionable. ... epithets or comments which are merely offensive will not establish a hostile work environment claim." El-Sioufi, 887 A.2d at 1190 (citations and internal quotations omitted). The NJLAD "is not intended to be a 'general civility code' for conduct in the workplace ... Discourtesy or rudeness should not be confused with ... harassment, and a 'lack of ... sensitivity' does not, alone, amount to actionable harassment. Thus, 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' of employment." Heitzman v. Monmouth Cnty., 728 A.2d 297, 304 (N.J. Super. Ct. App. Div. 1999), overruled on other grounds, Cutler, 955 A.2d 917(2008). That having been said, "in certain circumstances, even a single [incident] can be so severe as to pollute the work environment, rendering it irretrievably hostile." Cutler, 955 A.2d at 925 n.7. While it does not appear that Shaw's actions interfered with Plaintiff's ability to perform his job duties, his conduct exceeded mere off-handed comments. In addition to repeated, unexplained, and potentially offensive touching of the Plaintiff's shoulder, Shaw also touched himself in a sexually suggestive way. More disturbing is the contention that Shaw rubbed Plaintiff from behind with his midsection and penis, a form of physical assault, and therefore physically threatening or humiliating. Moreover, Shaw's remarks explicitly referenced sexual acts. In addition, this behavior was observed by others and occurred in conjunction with sexually offensive conduct by Shaw toward another employee. We are unable to conclude that the totality of these circumstances here are not sufficiently severe and pervasive as a matter of law. These were not isolated acts but part of a practice and pattern. It might fairly be said that it was "the cumulative impact of separate successive incidents that cements the hostile work environment." Cutler, 955 A.2d at 925. In any event, in light of our determination that Shaw was not a supervisor and the Lidestri had a vigorous anti-discrimination policy in place that worked, we need not resolve this issue.

16

imposition of vicarious liability on Lidestri for Shaw's conduct and thus Lidestri is still entitled to summary judgment on Plaintiff's sexual harassment hostile work environment claim. Plaintiff makes two arguments relevant to Lidestri's liability asserting first that Lidestri is vicariously liable for Shaw's actions because Shaw was a supervisor capable of controlling Plaintiff's work environment.  (Pl.'s Opp'n 3.)  Additionally, Plaintiff contends Lidestri is liable for its "failure to publish and train upon an effective [anti-sexual harassment] policy for all employees."  (Id.)

> (i)  *Whether Shaw Qualifies as a Supervisor*

An employer's liability under the NJLAD for claims related to sexual harassment by a supervisor is largely dependant upon the facts of a particular case.  Lehmann, 626 A.2d at 464. Generally, an employer can be held vicariously liable for conduct of a supervisor where the supervisor acted within the scope of his or her employment.  Id.  Additionally, in the more common situation where the supervisor acted outside the scope of his or her employment, the employer can be held vicariously liable "if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship."  Id.; see also Herman v. Coastal Corp., 791 A.2d 238, 251 (N.J. Super. Ct. App. Div. 2002) (explaining

17

that an employer cannot be held liable for sexual harassment
under the NJLAD "in the absence of a showing that the harassing
employee was acting within the scope of his employment, or that
the employer was negligent, or had intended the conduct.")

Thus, as explained by the New Jersey Supreme Court in
Lehmann, "an employer can be held liable for compensatory damages
stemming from a supervisor's creation of a hostile work
environment" in one of three circumstances: (1) where "the
employer grants the supervisor the authority to control the
working environment and the supervisor abuses that authority to
create a hostile work environment[;]" or (2) where "the employer
ha[s] actual or constructive notice of the harassment[;]" or (3)
where, in the absence of actual or constructive notice, "the
employer negligently or recklessly failed to have an explicit
policy that bans sexual harassment and that provides an effective
procedure for the prompt investigation and remediation of such
claims."  626 A.2d at 464.

"A supervisor has a unique role in shaping the work
environment.  Part of a supervisor's responsibilities is the duty
to prevent, avoid, and rectify invidious harassment in the
workplace."  Herman, 791 A.2d at 252.  Determining precisely
which employees qualify as supervisors "for purposes of vicarious
liability for compensatory damages" depends upon the "functional
assignments" those employees maintain in the workplace.  Cavuoti

18

v. New Jersey Transit Corp., 735 A.2d 548, 558 (1999).  Moreover, the use of "a mere title of 'manager' or 'supervisor' does not by itself suffice to impute that employee's knowledge or actions to the employer."  Id. at 557-58.  Putting aside arbitrary position titles utilized by any given employer then, generally "a supervisor has the authority to hire, fire, discipline, control employees' wages or control employees' schedules."  Herman, 791 A.2d at 254 (citing Cavuoti, 735 A.2d at 558).  As recognized by New Jersey courts, "[a]n employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor 'to control the day-to-day working environment' facilitates harassing conduct."  Herman, 791 A.2d at 254 (citation omitted); see also Lehmann, 626 A.2d at 462.

To determine whether an offending employee qualifies as a supervisor, the Court must consider "whether the power the offending employee possessed was reasonably perceived by the victim, accurately or not, as giving that employee the power to adversely affect the victim's working life."  Entrot v. BASF Corp., 819 A.2d 447, 459 (N.J. Super. Ct. App. Div.2003).  Relevant factors in this determination include the power to fire or demote, the power to direct job functions, and any evidence that the alleged harasser possessed influence to control the workplace or restrict the alleged victim's freedom to ignore the

alleged conduct.  Id.

Here, Plaintiff has failed to establish sufficient facts
from which a reasonable jury could find that Shaw qualifies as a
"supervisor" under the NJLAD for purposes of holding Lidestri
vicariously liable for his conduct.  Although Shaw's job title
was that of a warehouse shift manager, the record demonstrates
that Shaw did not have any power to fire or demote Plaintiff,[9] to
set Plaintiff's schedule, or to exercise control over Plaintiff's
wages or any other form of compensation Plaintiff received.  The
record also establishes that Shaw did not have any power to
discipline Plaintiff.  In particular, it appears that warehouse
shift managers like Shaw, Valladares, and DiMaio, only had
authority to report disciplinary issues to Human Resources by
completing Employee Disciplinary Reports.  (Employee Disciplinary
Reports, Ex. 14 to Lidestri's Statement 1-6.)  These managers,
however, did not make the final determination of disciplinary
claims because Employee Disciplinary Reports required that a
Personnel Department (Human Resources) employee, typically
Jehens, sign off on the Report.  (Id.)

Perhaps the most telling evidence of whether Plaintiff
reasonably perceived Shaw as possessing the power to adversely

---

[9] In this regard, the record makes clear that decisions
regarding terminations and demotions were handled by Jehens in
Human Resources with the guidance or approval of Oca, the
Corporate Human Resources Manager.

affect Plaintiff's working life is the testimony of Plaintiff
himself.  Plaintiff testified that while all the warehouse shift
managers were his supervisors, he considered Roger Valladares to
be his main supervisor at Lidestri and that the other supervisors
"were just covering" on other days of the week.  (Ex. 2 to
Lidestri's Statement, Tr. of Pl.'s Dep. 85:22-24, 86:5-8.)
Plaintiff explicitly indicated that the other supervisors, like
Shaw, "didn't have anything to do with us, they were not our
supervisors." (Id.)  This testimony leaves no doubt that
Plaintiff did not perceive Shaw as a supervisor who possessed
power to adversely affect Plaintiff's work environment.

It is also undisputed that Shaw's main responsibility was
oversight of the 1600 Building where his office was located, and
that he only came by the 1550 Building where Plaintiff worked
approximately two or three times a day in passing to ensure that
the employees were completing their assignments.  Accordingly,
the record reflects that Shaw did not possess any notable degree
of control over Plaintiff's day-to-day work environment in the
1550 Building particularly where Plaintiff only worked with Shaw
one day a week on Thursdays.  No reasonable jury could infer that
these infrequent and minimal visits one day a week by another
"supervisor" who was "just covering" for Plaintiff's "main
supervisor" and who "didn't have anything to do" with Plaintiff,
amounted to day-to-day control over Plaintiff's working

environment in the 1550 Building.

Even assuming Plaintiff perceived Shaw as possessing some sort of power over Plaintiff, this perception certainly did not restrict Plaintiff's freedom and ability to ignore Shaw's conduct. Specifically, Plaintiff repeatedly testified at his deposition that he typically responded to Shaw's conduct by indicating his disapproval including through the use of explicit language, by protesting Shaw's attempt to "play games" with Plaintiff, by walking away, and by pretending not to see Shaw. (See Ex. 2 to Lidestri's Statement, Tr. of Pl.'s Dep. 59:2-15, 61:6-11, 64:12-13, 65:11-16, 19-20, 77:2-7; see also Pl.'s Further Statement of Undisputed Material Facts ¶ 28.)

Plaintiff, as the party opposing summary judgment on this issue, is required to identify specific facts and affirmative evidence that contradict those offered by Lidestri. Plaintiff has failed to do so here and argues only that "the harassment was in fact conducted by a supervisor, that same supervisor was aware of his own conduct" and "[t]hus, Defendant had knowledge of the same through its agents to whom they delegated responsibility." (Pl.'s Br. 8.) The New Jersey Supreme Court has expressly rejected Plaintiff's argument and held that "a mere title of 'manager' or 'supervisor' does not by itself suffice to impute that employee's knowledge or actions to the employer." Cavuoti, 735 A.2d at 558. To impose liability on Lidestri for Shaw's

conduct, Plaintiff was required to demonstrate more.  He has failed to do so and thus Lidestri is entitled to summary judgment on Plaintiff's sexual harassment claim because Shaw does not qualify as a supervisor under the NJLAD.

*(ii) Maintenance of an Anti-Harassment Policy*

As an alternative basis for liability, Plaintiff argues that Lidestri negligently failed to publish and conduct training pursuant to an effective anti-sexual harassment policy for all employees.  (Pl.'s Br. 3.)  Under New Jersey law, courts "adhere to the principle that if an employer has exercised due care in acting to prevent a sexually discriminatory hostile work environment, vicarious liability should not attach.  The establishment of an effective anti-sexual harassment workplace policy and complaint mechanism evidences an employer's due care and may provide affirmative protection from vicarious liability." Gaines v. Bellino, 801 A.2d 322, 323 (N.J. 2002); see also Cavuoti, 735 A.2d at 556 (recognizing that New Jersey law "afford[s] a form of a safe haven [from vicarious liability for the harassing conduct of an employee] for employers who promulgate and support an active, anti-harassment policy.")

In order for an employer to enjoy the benefit of that safe haven from vicarious liability based on maintaining an active anti-harassment policy, the following circumstances are "relevant: periodic publication of the employer's anti-harassment

23

policy, the presence of an effective and practical grievance process for employees to use, and training for workers, supervisors, and managers concerning how to recognize and eradicate unlawful harassment." Gaines, 801 A.2d at 330 (citing Cavuoti, 735 A.2d at 556).

Additionally, "[a]n employer has a clear duty not only to take strong and aggressive measures to prevent invidious harassment, but also to correct and remediate promptly such conduct when it occurs." Herman, 791 A.2d at 252 (citing Payton v. New Jersey Turnpike Auth., 691 A.2d 321, 327-28 (1997)). As the New Jersey Supreme Court noted in Gaines, "[t]he efficacy of an employer's remedial program is highly pertinent to an employer's defense" that its actions absolve it from all liability for a plaintiff's claims. 801 A.2d at 330 (citing Payton, 691 A.2d at 327). "'[E]ffective' remedial measures ... include the process by which the employer arrives at the sanctions that it imposes on the alleged harasser" and are reviewed in light of the "investigation—including [its] timeliness, thoroughness, [the] attitude toward the allegedly harassed employee, and the like—as well as by the result[.]" Payton, 691 A.2d at 327.

Plaintiff relies on Gaines for the proposition that the mere existence of an anti-harassment policy alone is insufficient to defeat a harassment claim, particularly on summary judgment.

24

(Pl.'s Br. 7.)  Plaintiff contends that in this case "there clearly exist genuine issues of material fact as to whether Defendant implemented an effective anti-harassment policy." (Id.)  As an initial matter, Plaintiff argues that there was "no 'unequivocal commitment from the top in this matter'" to demonstrate that Lidestri's policies against sexual harassment were more than mere words, but were backed up by consistent practice.  (Id.)  Plaintiff specifically relies on the fact that the complained-of conduct here came from a member of management and that other members of management were aware of Plaintiff's allegations and did not report the allegations.[10]    (Id. at 7-8.) Plaintiff also argues that Lidestri never conducted any classes, seminars, trainings, or other instructional opportunities for non-managerial employees, like Plaintiff, regarding the company's policies.  (Id. at 8.)  Finally, Plaintiff points to the fact that Lidestri's policies were revised after Plaintiff was hired but that he never received an updated version of the policy. (Id.)

---

[10] In his attempt to argue that there was no commitment from the top to enforce Lidestri's policies, Plaintiff notes that Roger Valladares was purportedly terminated for his failure to report allegations of sexual harassment based on Shaw's conduct. Rather than establishing that Lidestri's policies were mere words, Plaintiff's argument actually supports the notion that Lidestri backed up its policies in practice, taking sexual harassment allegations so seriously, that the company not only terminated the alleged harasser, Shaw, but also a member of management who failed to timely report Plaintiff's allegations.

Despite Plaintiff's arguments, the Court finds that there is no evidence in this case demonstrating that Lidestri's policies were merely words.  Rather, it is undisputed that Lidestri maintains both a "Sexual Harassment" policy which expressly prohibits sexual discrimination or harassment, and a broader "Non-Harassment" policy, both of which are set forth not only in the employee handbook, but are separately provided to new employees at the time they are hired by Lidestri to emphasize their importance.  (Lidestri's Statement ¶¶ 3-4, 8; Pl.'s Statement ¶¶ 3-4, 8.)  It is also undisputed that both of these policies are specifically reviewed with employees as part of their new employee orientation, and that employees are required to sign off on receipt of both policies.  (Lidestri's Statement ¶¶ 5-6; Pl.'s Statement ¶¶ 5-6.)  Plaintiff concedes that at the time he was hired, he signed both of Lidestri's policies, but failed to read either of them.[11]  (Lidestri's Statement ¶ 7; Pl.'s Statement ¶ 7; Pl.'s Further Statement of Undisputed Material Facts ¶ 1.)

The Sexual Harassment policy provides for a reporting mechanism regarding complaints whereby "[e]mployees who believe they have been the subject of sexual harassment should report their charge immediately to any supervisor or Jane Oca in the

---

[11] Plaintiff notes that he never received a copy of either policies for his own personal retention.  (Pl.'s Further Statement of Undisputed Material Facts ¶ 2.)

Human Resources Department" and Oca's contact information is readily accessible on the company website, and was so in 2010. (Lidestri's Statement ¶¶ 9-10; Pl.'s Statement ¶¶ 9-10.)  The Sexual Harassment policy further explains that Lidestri will promptly and throughly investigate all complaints.  (Lidestri's Statement ¶ 11; Pl.'s Statement ¶ 11.)

In the face of this evidence the Court finds that this case is distinguishable from <u>Gaines</u>, where several issues of disputed facts were present, and that no reasonable jury could conclude that Defendant did not have an adequate anti-harassment policy in place.  Lidestri made periodic publication of its policies available to employees through the hiring and orientation process; presented employees with a practical and effective grievance process for reporting complaints to any supervisor or member of the Human Resources Department in the company; by providing employees a certain degree of training and review of the policy during orientation; and by providing supplemental training on the relevant policies to supervisors and management employees.

Furthermore, the Court must consider the efficacy of Lidestri's remedial program because it is highly pertinent to Lidestri's defense that its actions absolve it from liability here.  In this regard, the record evidence demonstrates that as soon as Plaintiff's complaint letter was brought to the attention

27

of the company on December 13, 2010, Lidestri took swift and thorough action to investigate Plaintiff's allegations and put a stop to Shaw's conduct.  Specifically, Lidestri received Plaintiff's complaint letter on December 13, 2010 at 4:45 p.m., through Jehens, its top Human Resource official at the Pennsuaken facility.  The following morning, Jehens began an internal investigation of Plaintiff's allegations against Shaw, and Lidestri suspended Shaw immediately pending the outcome of the investigation in order to prevent Shaw from engaging in any further conduct.  Jehens' investigation consisted of interviews of ten Lidestri employees over an eight (8) day period.  Within just one day of completing her investigation, Jehens reported her findings to Oca, Lidestri's Corporate Human Resources Manager, who consulted Lidestri's Vice-President, Donna Yanicky, and the Director of the Warehouse, Lee Biscardi.  That same day, December 22, 2010, these individuals collectively decided to terminate Shaw's employment based on Plaintiff's allegations — just eleven days from the receipt of Plaintiff's letter, and a mere seven business days.  This undisputed evidence is sufficient to support the grant of summary judgment to Lidestri on Plaintiff's sexual harassment claim.

### B.  Retaliation Claims

Plaintiff alleges that he suffered two forms of retaliation in this case.  Initially, he claims he was subjected to

retaliation by Carter and DiMaio who were "overchecking" his worksite after Shaw was terminated in December of 2010.[12] Additionally he asserts that he was terminated in retaliation for complaining about Shaw's sexual harassment.  With respect to these claims, Lidestri argues that being subjected to "overchecking" or "micro-management" by supervisors does not constitute an adverse employment action for purposes of a prima facie case of retaliation.  (Def.'s Br. 17.)  Lidestri also contends that Plaintiff cannot demonstrate a prima facie case of retaliatory termination because Plaintiff cannot establish any causal connection between his internal harassment complaint and his termination.  (Id. at 18.)  Lidestri further argues that even if Plaintiff could demonstrate the required causal link, Plaintiff has failed to demonstrate any evidence that Lidestri's proffered reason for his termination, disciplinary violations, is merely a pretext.  (Id.)

As a threshold matter, the Court finds that Plaintiff's contention that he was subjected to retaliation by supervisors who were "overchecking" his worksite fails to qualify as an adverse employment action under the NJLAD.  While the NJLAD does not provide an exhaustive list of what constitutes an actionable

_____

[12] Plaintiff makes clear in his opposition that he is asserting a cause of action for retaliatory harassment for the time period between his internal complaint, December 13, 2010, and his termination, January 13, 2011; and a second cause of action for his retaliatory discharge.  (Pl.'s Opp'n 9.)

reprisal or adverse employment decision and there are no bright line rules defining an adverse employment action, New Jersey courts have looked to federal cases interpreting Title VII and Civil Rights legislation in order "to determine what constitutes an adverse employment decision in the context of an LAD retaliation claim." Mancini v. Twp. of Teaneck, 794 A.2d 185, 207 (N.J. Super. Ct. App. Div. 2002). Factors relevant to this determination include whether the alleged retaliatory conduct resulted in the employee's "loss of status, clouding of responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees." Id. (citations omitted).

The Third Circuit has found that retaliatory conduct in the Title VII context constitutes an adverse employment action "only if it alters the employee's compensation, terms, conditions, or privileges of employment, or deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997). However, not every minor employment action that makes an employee "unhappy" constitutes retaliatory conduct. Id. An adverse action for purposes of Title VII refers to a "*significant* change in employment status, such as hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits." Weston v. Pennsylvania, 251

F.3d 420, 431 (3d Cir. 2001) (emphasis added).

     With these guidelines in mind, the Court finds that
Plaintiff's allegations that his supervisors subjected him to
"overchecking", "micro-management", and targeted him by
questioning everything he did and pointing out things he did
wrong, are woefully insufficient to constitute adverse employment
actions or reprisals against Plaintiff for his protected
activity.  Plaintiff has failed to present any evidence
demonstrating that any of this alleged conduct resulted in a
significant change in his employment status.  Accordingly,
Plaintiff cannot maintain a claim for retaliation based on being
subjected to "overchecking" and "micro-management", even if it
was done in a manner that Plaintiff considered intimidating or
uncomfortable.  See Buffa v. New Jersey State Dept. of Judiciary,
56 F. App'x 571, 576 (3d Cir. 2003) (concluding that being
"subjected to harassment, intense scrutiny and overly-critical
supervision as a result of having filed grievances" does not
"qualify as [an] adverse employment action[].").

     As to Plaintiff's claim that he was terminated for bringing
a sexual harassment complaint based on Shaw's conduct, even if
the Court assumes for purposes of this motion that Plaintiff has
satisfied his burden to establish a prima facie case, the Court
finds that Lidestri is still entitled to summary judgment.
Lidestri has articulated a legitimate, non-retaliatory reason for

Plaintiff's termination – that Plaintiff was terminated for insubordination and cursing at another supervisor – Plaintiff's seventh disciplinary infraction since April of 2010.  (See Employee Disciplinary Reports for Jorrin, Ex. 14 to Lidestri's Statement 1-6.)

The undisputed documentary evidence establishes that Plaintiff was repeatedly disciplined at Lidestri for violating company conduct rules, on two separate occasions for excessive absenteeism and tardiness, for taking an unauthorized extended lunch break in violation of company policy, for violating a company parking policy despite notice of the same, for attending a training session without being scheduled for it such that management could not locate Plaintiff during his shift, for failure to follow instructions, and for performing substandard work.  (Id.)  These disciplinary infractions resulted in Plaintiff twice being suspended from employment with Lidestri.

Five of Plaintiff's Employee Discipline Reports indicate that the consequences of Plaintiff's failure to improve would result in "[d]iscipline up to and including termination."  (Id. at 1-5.)  Plaintiff's September 20, 2010 Employee Discipline Report, by contrast, notes that Plaintiff "needs to follow instructions and adhere to company procedures" and that "[t]his employee is more of a liability than an asset to the organization."  (Id. at 6.)  The September 20, 2010 report

32

explicitly calls for "[i]mmediate termination" of employment if Plaintiff did not improve.  (Id.)  Plaintiff also testified that was aware his job was at risk based upon his September 20, 2010 suspension.  (Lidestri's Statement ¶ 67; Pl.'s Statement ¶ 67.)

In light of these undisputed facts, the Court is satisfied that Lidestri has met its burden to articulate a legitimate, non-retaliatory reason for Plaintiff's termination.  That is, Lidestri did not terminate Plaintiff in retaliation for bringing a sexual harassment complaint against Shaw, but rather, Plaintiff was terminated for insubordination and cursing at a shift supervisor, after having twice been previously suspended from employment for disciplinary infractions and having been subjected repeatedly to disciplinary action for failure to follow instructions.  His termination was consistent with his September 20, 2010 Employee Discipline Report which sought immediate termination if Plaintiff did not improve his ability to follow instructions.

Accordingly, the burden shifts to Plaintiff to come forward with evidence of a discriminatory motive and to demonstrate that Lidestri's proffered reason is merely a pretext.  Young, 897 A.2d at 1073; see also Goldie v. Jones, 2009 WL 2475342, at *4 (N.J. Super. Ct. App. Div. Aug. 14, 2009) (citing Kolb v. Burns, 727 A.2d 525, 531 (N.J. Super. Ct. App. Div. 1999) (noting that "the plaintiff 'has the ultimate burden of proving that the employer's

proffered reasons were a pretext for the discriminatory action.'"). To survive a motion for summary judgment, Plaintiff is not required to "provide direct evidence that [the] employer acted for discriminatory reasons[.]" Kolb, 727 A.2d at 531. Plaintiff "need only point to sufficient evidence to support an inference that the employer did not act for its proffered non-discriminatory reasons." Id. Plaintiff, "as the nonmoving party, 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."'" Id. (citing Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994)). To defeat summary judgment, Plaintiff "must raise a genuine issue of material fact regarding whether the employer's proffered explanation is pretextual or whether, the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" Kolb, 727 A.2d at 531.

In meeting his burden to demonstrate pretext, Plaintiff may not, however, rest on mere allegations or denials of the pleadings, and must identify, by affidavits or otherwise, specific facts showing there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Saldana, 260 F.3d at 232. Thus, to

withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57.

Plaintiff has failed to meet his burden here to demonstrate that Lidestri's proffered reason is merely a pretext for an underlying discriminatory motive.  Plaintiff's opposition to Lidestri's motion does not identify a single discernible fact or piece of affirmative evidence to demonstrate pretext in this case.  Plaintiff simply points to his own deposition testimony wherein he denies that he cursed at a shift supervisor or was guilty of insubordination.  These conclusory, self-serving denials are insufficient to demonstrate that Lidestri's legitimate, non-retaliatory reason was a pretext.[13]  Thus there is no evidence from which a reasonable factfinder could conclude that Lidestri's proffered reason is unworthy of credence and

---

[13] The notion that Plaintiff was terminated in retaliation for his complaint of sexual harassment is not only inconsistent with Lidestri's swift, effective, and through handling of the complaint resulting in Shaw's immediate suspension and prompt termination, but also with Plaintiff's testimony that on the day Shaw was terminated, Jehens met with Plaintiff to inform him Shaw was being let go and requested that "in the future" Plaintiff come to Jehens with whatever problems he had or if he felt uncomfortable in the workplace.  (Ex. 2 to Lidestri's Statement, Tr. of Pl.'s Dep. 107:17-22.)  Plaintiff's own acknowledgment that Lidestri, through Jehens, reached out to Plaintiff regarding future incidents that Plaintiff might encounter in the workplace, also dispels any notion that Lidestri's reason for terminating Plaintiff was a pretext for retaliation based on the sexual harassment complaint.

infer that Lidestri did not act for its asserted, non-discriminatory reason.

In these circumstances, Plaintiff has failed to meet his burden to defeat summary judgment on the issue of pretext. Plaintiff has not come forward with adequate evidence raising a genuine issue of material fact as to whether Lidestri's proffered reason is a pretext sufficient for a jury to infer that retaliatory discrimination was more likely than not a determinative factor in terminating Plaintiff's employment.  See Kolb, 727 A.2d at 531.  Accordingly, Lidestri is entitled to summary judgment on Plaintiff's claim.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant Lidestri Foods, Inc.'s motion for summary judgment is granted.  An Order consistent with this Opinion will be entered.


Dated: <u>March 28, 2013</u>           <u>  s/ Noel L. Hillman  </u>
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.